**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RHONDA ANITA BLACKMAN,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 20-cv-04392-RAL** |
| | : | |
| **KILOLO KIJAKAZI,**[1] | : | |
| **Acting Commissioner of Social** | : | |
| **Security** | : | |
| | : | |
| **Defendant.** | : | |

**MEMORANDUM OPINION**

**RICHARD A. LLORET**                                                    **July 15, 2022**
**U.S. MAGISTRATE JUDGE**

## I.    INTRODUCTION

An Administrative Law Judge ("ALJ") denied Rhonda Anita Blackman Social

Security benefits on November 29, 2019, deciding that Ms. Blackman failed to carry her

burden of proving she suffered from a condition or combination of conditions that were

work preclusive. Administrative Record ("R.") 26-47. Ms. Blackman contends that the

unfavorable decision was reached in error. Doc. No. 14 ("Pl. Br.") at 3-19. Ms. Blackman

argues that: (1) the ALJ's residual functional capacity (RFC) finding is not supported by

substantial evidence because the ALJ failed to properly evaluate the opinion evidence

about Ms. Blackman's mental condition submitted by (a) Judith Stern, Psy.D., and (b)

Amelia Withington, M.D., both treating physicians; and (2) the RFC determination is

not supported by substantial evidence because the ALJ failed to properly evaluate the

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule
25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for Andrew Saul as
Defendant. No further action need be taken to continue this suit by reason of the last sentence of section
205(g) of the Social Security Act, 42 U.S.C. § 405(g).

opinion evidence about Ms. Blackman's physical condition submitted by Dr. Withington; (3) failed to conduct a function-by-function analysis; and (4) failed to incorporate the use of a cane into the RFC, thereby negating the evidentiary value of the Vocational Expert's (VE) testimony. *Id.* at 1. The Acting Commissioner of Social Security ("Commissioner") responds that substantial evidence, as that term is defined by Social Security regulations and case law, supports the ALJ's conclusion that Ms. Blackman can still perform other work existing in significant numbers in the national economy. Doc. No. 15 ("Com. Resp.") at 2. Therefore, the Commissioner contends, the ALJ's decision should be upheld.

After careful review, I find that the ALJ's decision was not supported by substantial evidence, in that the ALJ rejected the treating therapist's and psychiatrist's opinions in part for improper reasons, and in part with an inadequate explanation concerning conflicting medical evidence. Because I will remand on this basis, I do not address the other issues at length. I will grant the Plaintiff's request for review and enter an order remanding the case to the Commissioner for further proceedings.

## II.   <u>PROCEDURAL HISTORY</u>

Ms. Blackman filed a claim for supplemental security income ("SSI") on May 3, 2018.[2] R. 92-93. Her application was initially denied on December 19, 2018. R. 106. A hearing was held before ALJ Jessica Marie Johnson on October 3, 2019. R. 65-91. ALJ Johnson found Ms. Blackman was not disabled in a November 29, 2019 opinion. R. 26-48. The Appeals Council denied review on July 6, 2020, making the ALJ's decision the

---

[2] The procedure by which the Social Security Administration evaluated medical opinions changed on March 27, 2017. Ms. Blackman's claim is reviewed using the new regulations in place beginning March 27, 2017. *See* 20 C.F.R. § 416.920c, "How we consider and articulate medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017."

Commissioner's final decision. R. 1. Plaintiff filed a complaint in this court on June 25, 2021. Pl. Br. at 1.

III.   **FACTS**

Ms. Blackman was 39 years old at the time she filed her application, and 41 years old on the date of the ALJ's decision. R. 26, 92. Her medical records contain treatment for both physical and mental health issues. Ms. Blackman was treated for her psychiatric problems by Dr. Amelia Withington, M.D. from January 2018 to April 2019. R. 564-625, 646-705. Ms. Blackman met with therapist Judith Stern, Psy.D., on a weekly basis from November 6, 2018 through at least July 1, 2019. R. 741. Dr. Stern provided a mental impairment questionnaire which included specific findings, but did not provide her treatment notes. R. 738-41. Dr. Withington, however, provided treatment notes from her sessions with Ms. Blackman. R. 748-51, 763, 768-74.

In addition to her well-documented psychiatric problems, Ms. Blackman has had recurring problems with her knees, most recently the left knee. She wears a brace and uses a cane to ambulate. In all, Ms. Blackman's medical records span nearly nine hundred pages.[3] The opinions of Ms. Blackman's treating psychiatrist and therapist, had they been accepted by the ALJ, would support a finding of disability.

**A. Claimant's Background**

Ms. Blackman has a high school education, and she has performed past work described as a home health aide and janitor. R. 261.[4] Ms. Blackman claims, and the Commissioner agrees, that she has a total of six severe impairments. R. 31.

---

[3] Where necessary, I will discuss details of those medical records within my discussion of the legal issues.

[4] Past relevant work is defined by the Social Security Administration as work done within the past 15 years, that qualifies as "substantial gainful activity," and that lasted long enough for the claimant to have learned to do it. 20 C.F.R. § 404.1560(b)(1) and 416.960(b)(1).

### B.  The ALJ's Decision

In reaching her decision, the ALJ made the following findings of fact and conclusions of law pursuant to Social Security's five-step sequential evaluation.[5]

At step one, the ALJ concluded that Ms. Blackman has not engaged in substantial gainful activity since her application date of May 3, 2018. R. 31. At step two, the ALJ determined that Ms. Blackman had the following six severe impairments: 1) osteoarthritis of both knees, 2) chondromalacia patella of the left knee, 3) cubital tunnel syndrome, 4) obesity, 5) depressive disorder, and 6) post-traumatic stress disorder (PTSD). *Id*. The ALJ also found a number of non-severe impairments, including: hiatal hernia, gastroesophageal reflux disease (GERD), renal cysts, and urinary urgency. *Id*. At step three, the ALJ compared Ms. Blackman's impairments to those contained in the "Listings,"[6] specifically examining Listing 1.02A (major dysfunction of the joints), and Listings 12.04 and 12.15, which deal with mental impairments. R. 32-33. The ALJ concluded that none of Ms. Blackman's impairments, alone or in combination, met or equaled the criteria of any of the Listings. R. 32-35.

---

[5] An ALJ evaluates each case using a sequential process until a finding of "disabled" or "not disabled" is reached. The sequence requires an ALJ to assess whether a claimant: (1) is engaging in substantial gainful activity; (2) has a severe "medically determinable" physical or mental impairment or combination of impairments; (3) has an impairment or combination of impairments that meet or equal the criteria listed in the Social Security Regulations and mandate a finding of disability; (4) has the residual functional capacity to perform the requirements of his or her past relevant work, if any; and (5) is able to perform any other work in the national economy, taking into consideration his or her residual functional capacity, age, education, and work experience. *See* 20 C.F.R. § 416.920(a)(4)(i)–(v).

[6] The regulations contain a series of "Listings" that describe symptomology related to various impairments. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. If a claimant's documented symptoms meet or equal one of the listed impairments, "the claimant is conclusively presumed to be disabled." *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987). If not, the sequential evaluation continues to step four, where the ALJ determines whether the impairments assessed at step two preclude the claimant from performing any relevant work they may have performed in the past. *Id*.

The sequential evaluation then proceeded to step four, prior to which the ALJ determined Ms. Blackman's residual functional capacity ("RFC"). 20 C.F.R. § 416.945(a). To determine Ms. Blackman's RFC, the ALJ reviewed the available medical opinion evidence. Based on this review, the ALJ concluded that Ms. Blackman is able to perform light work, with some exceptions.[7] R. 854. These exceptions include:

> [Ms. Blackman] can occasionally operate left sided foot controls. She can frequently balance and stoop; occasionally crouch, kneel, crawl, and climb ramps and stairs; and never climb ladders, ropes, or scaffolds. She can frequently handle, finger, and feel with the right upper extremity. She can have occasional exposure to weather, non-weather related extreme cold temperatures, wetness, and humidity, and no exposure to dangerous machinery or unprotected heights. She is limited to simple, routine, and repetitive tasks; to occasional simple decision making; to occasional routine changes in the work environment; and to occasional interaction with supervisors, coworkers, and the public.

R. 35.

In making this finding, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" as required by Social Security regulations 20 CFR § 416.929 and SSR 16-3P. *Id.* She also advised that she "considered the medical opinion(s) and prior administrative finding(s) in accordance with the requirements of 20 CFR § 416.920c." *Id.* Following this recitation, the ALJ discussed the August 2018 Function report, prepared by Ms. Blackman, and her testimony. R. 35-36. With respect to these

---

[7] 20 C.F.R. §416.967(b) states the definition of "light work," in pertinent part, as follows:
A job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.
20 C.F.R. §416.967(b), Physical exertion requirements.

statements by the Plaintiff, the ALJ concluded that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record, for the reasons explained in this decision." R. 39. The ALJ also examined opinions from Melissa Franks, Psy.D., Louis Tedesco, M.D., (both state agency consultants); Dr. Laurence Miller, who provided an opinion in December 2018; and treating doctors Judith Stern, Psy.D., and Amelia Withington, M.D. R. 40-42. The ALJ found the opinions of the two treating physicians, whose reports post-dated the other three doctors by nearly a year, unpersuasive, R. 41, 42, while finding the opinions of the state agency consultants "persuasive" (Dr. Franks), and "mostly persuasive," (Dr. Tedesco). R. 40. The ALJ also found Dr. Miller's opinion "persuasive." R. 41.

The ALJ then found that Ms. Blackman is unable to perform any past relevant work, as a home attendant and janitor. R. 42-43. The Vocational Expert (VE) testified that both jobs were semi-skilled work and are generally performed at the medium exertional level, which would exceed the residual functional capacity found by the ALJ. R. 43.

Having found no past relevant work that Ms. Blackman could perform, the ALJ proceeded to Step Five. Accepting the testimony of the vocational expert at the October 3, 2019 hearing, that jobs existed in sufficient numbers for a hypothetical individual who could perform light work, further limited by the physical limitations set forth in the Residual Functional Capacity (RFC) finding, *supra* at 5, with mental limitations stated as: "limited to simple, routine, and repetitive tasks; to occasional simple decision making; to occasional routine changes in the work environment; and to occasional interaction with supervisors, coworkers, and the public," R. 35, the ALJ found Ms.

Blackman not disabled, as she could perform work as a "photo copy machinery operator," a "marker," or a "router," all of which qualify as "light" work, as those terms are defined by the Dictionary of Occupational Titles." R. 44.[8]

Because the ALJ identified jobs Ms. Blackman could perform, she ultimately concluded that Ms. Blackman is "not disabled." R. 44.

## IV.   STANDARDS OF REVIEW

Ms. Blackman has the burden of showing that the ALJ's decision was not based on "substantial evidence." 42 U.S.C. § 405(g); *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). "Substantial evidence" is not a high standard. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citations and internal quotations omitted).

I exercise "plenary review over questions of law." *Newell v. Commissioner of Social Security*, 347 F.3d 541, 545 (3d Cir. 2003) (citation omitted). I must determine whether the ALJ applied the proper legal standards in reaching the decision. *See Coria v. Heckler*, 750 F.2d 245, 247 (3d Cir. 1984); *see also Trinh v. Astrue*, 900 F. Supp. 2d 515, 518 (3d Cir. 2012) (citing to *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001)). Accordingly, I can overturn an ALJ's decision based on a harmful legal error even when I find that the decision is supported by substantial evidence. *Payton v. Barnhart*, 416 F.

---

[8] The ALJ posed three hypothetical questions to the Vocational Expert at the hearing, each being more restrictive. R. 88-90. In the second hypothetical, where the ALJ added the use of a cane to the previous limitations (those in the ultimate RFC), the VE testified that only sedentary jobs would be appropriate. R. 89. When the ALJ added four or more absences in the third hypothetical, the VE opined that the limitations were work preclusive. R. 90. Given this testimony, counsel for Ms. Blackman chose not to pose any additional hypothetical questions to the VE. *Id.* The ALJ did not discuss the second and third hypotheticals in her decision.

Supp. 2d 385, 387 (E.D. Pa. 2006) (citing *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983).

An ALJ must provide sufficient detail in her opinion to permit meaningful judicial review. *Burnett v. Commissioner of Social Security Admin.*, 220 F.3d 112, 120 (3d Cir. 2000). When dealing with conflicting medical evidence, the ALJ must describe the evidence and explain her resolution of the conflict. As the Court of Appeals observed in *Plummer v. Apfel,* 186 F.3d 422, 429 (3d Cir. 1999),

> when a conflict in the evidence exists, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." *Mason v. Shalala,* 994 F.2d 1058, 1066 (3d Cir. 1993). The ALJ must consider all the evidence and give some reason for discounting the evidence [she] rejects. *See Stewart v. Secretary of H.E.W.,* 714 F.2d 287, 290 (3d Cir.1983).

While it is error for an ALJ to fail "to consider and explain his reasons for discounting all of the pertinent evidence before him in making his residual functional capacity determination . . .", *Burnett*, 220 F.3d at 121, an ALJ's decision is to be "read as a whole" when applying *Burnett. See Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004); *Caruso v. Commr. of Soc. Sec.*, 99 Fed. Appx. 376, 379–80 (3d Cir. 2004) (unpublished) (examination of the opinion as a whole permitted "the meaningful review required by *Burnett,*" and a finding that the "ALJ's conclusions [were] . . . supported by substantial evidence."). The issue is whether, by reading the ALJ's opinion as a whole against the record, the reviewing court can understand why the ALJ came to her decision and identify substantial evidence in the record supporting the decision. *Id.* at 379. I must rely on the record developed during the administrative proceedings along with the pleadings in making my determination. *Trinh*, 900 F.Supp.2d at 518; *see also* 42 U.S.C. § 405(g). I may not weigh the evidence or substitute my own conclusions for

those of the ALJ. *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011). I must also defer to the ALJ's evaluation of evidence, assessment of the witnesses, and reconciliation of conflicting expert opinions. *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 506 (3d Cir. 2009).

## V.    **DISCUSSION**

### A.    **The ALJ's RFC determination failed to adequately explain her reasons for rejecting the medical evidence found in the opinions of Judith Stern, Psy.D., and Amelia Withington, M.D., in favor of the opinions submitted by Melissa Franks, Psy.D. and Laurence Miller, M.D., precluding meaningful review.**

When evaluating whether a claimant meets the listing for a mental disorder, the ALJ must assess whether the claimant satisfies "paragraph B criteria," requiring a finding that the claimant has an "'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00A(1)(b). The four paragraph B criteria are "understand, remember, or apply information;" "interact with others;" "concentrate, persist, or maintain pace;" and "adapt or manage oneself." *Id.* § 12.00E(1)–(4). While a determination that a claimant's impairment meets relevant listing criteria is reserved for the ALJ, *see generally* 20 C.F.R. §§ 404.1525, 416.925, the ALJ must nevertheless sufficiently explain her rationales for discounting relevant evidence, including consultative opinions, *see Burnett*, 220 F.3d at 119–21.

There are four opinions addressing Ms. Blackman's mental impairments; one from from treating therapist Judith Stern, Psy.D., one from treating psychiatrist Amelia Withington, M.D., and one each from consulting physicians Melissa Franks, Psy.D., and Laurence Miller, M.D. While all four doctors agree that Ms. Blackman suffers from major depressive disorder, Bipolar 1 disorder, and auditory hallucinations, their

opinions differ in weighing these impairments' affect on Ms. Blackman's ability to remember and understand information, maintain concentration, persist in workday activities, interact with co-workers and supervisors, and adapt to work settings.

The ALJ concluded that the opinions of treating therapist Judith Stern, Psy. D., and treating psychiatrist Amelia Withington, M.D., that Ms. Blackman had extreme limitations in some categories due to her mental impairments, as well as marked limitations in others, were not persuasive. R. 41-42. Conversely, the ALJ found persuasive the opinions of Dr. Miller, who saw Ms. Blackman for a consulting examination in 2018, and Dr. Franks, who reviewed some, but not all, of Ms. Blackman's medical file. In rejecting the two treating doctors' findings, and accepting the findings of the agency consultants, the ALJ failed to adequately explain how she reconciled the conflicting medical opinions, and failed to account for significant evidence in the record which supported, and was consistent with, the rejected opinions. This was error.

Ms. Blackman's claim, filed on May 3, 2018, is subject to the new Social Security regulations with regard to the treatment of medical opinions, which became effective on March 27, 2017. The new regulations no longer require an ALJ to give a certain evidentiary weight to a medical opinion, but instead require the ALJ to focus on the persuasiveness of each opinion:

> We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources.

20 C.F.R. § 416.920c(a).

The regulations note that supportability and consistency "are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions ... to be." *Id.* § 416.920c(b)(2). Supportability means "[t]he more

relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) ... the more persuasive the medical opinions ... will be." *Id.* § 416.920c(c)(1). Consistency means "[t]he more consistent a medical opinion(s) ... is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) ... will be." *Id.* § 416.920c(c)(2). The regulations also instruct an ALJ to consider the physician's relationship with a claimant, whether the physician "has received advanced education and training" as a specialist, and other factors such as the medical source's familiarity with other evidence. *Id.* § 416.920c(c)(3)–(5). Only the concepts of consistency and supportability, however, must be addressed by ALJs in their written opinions. *Id.* § 416.920c(b)(2).

Despite providing a new analytical framework for ALJs, these regulations "[do] not authorize lay medical determinations by ALJs" and do not "relieve the ALJ of the responsibility of adequately articulating the basis for a medical opinion evaluation." *Kenyon v. Saul*, No. 1:20-CV-1372, 2021 WL 2015067, at \*4 (M.D. Pa. May 19, 2021). "While the ALJ is, of course, not bound to accept physicians' conclusions, [she] may not reject them unless [she] first weighs them against other relevant evidence and explains why certain evidence has been accepted and why other evidence has been rejected." *Cadillac v. Barnhart*, 84 F. App'x 163, 168 (3d Cir. 2003) (quoting *Kent v. Schweiker*, 710 F.2d 110, 115 n.5 (3d Cir. 1983)) (internal quotation omitted). Against this framework, I examine the opinions of the two treating doctors (which are consistent with one another), and the opinions of the two consulting doctors, prepared several months earlier, (which are largely consistent with one another but vastly different from the two treating doctors), and the ALJ's handling of those conflicting opinions.

### 1.    Judith Stern, Psy.D.

Judith Stern conducted weekly therapy sessions with Ms. Blackman, beginning on November 6, 2018, and continuing at least through July 1, 2019, the date she completed a Mental Impairment Questionnaire. R. 741. Dr. Stern[9] opined that Ms. Blackman had "extreme" limitations[10] in the following areas:

---

[9] Therapists who have attained a "Psy.D." degree, as Dr. Stern and Dr. Franks both have, are considered "doctors." "With the creation of the Doctor of Psychology degree, the APA confirmed that the Psy.D. is a credential that certifies attainment of the knowledge and skill required to establish clinical psychology as a profession. Furthermore, it follows the policies of both the Association of American Universities, and the Council of Graduate Schools: a professional doctorate (e.g., M.D., DDS, DVM) is awarded in recognition of preparation for professional practice, whereas the Ph.D. is awarded in recognition of preparation for research." https://en.wikipedia.org/wiki/Doctor_of_Psychology.
"[A]s a doctorate-holder, a person who has earned a Psy.D. could definitely refer to themselves as "Dr.," though it's good to note that Psy.D.'s are not medical doctors and in most states cannot prescribe medication or conduct medical treatments."
https://www.google.com/search?q=do+you+call+a+psyd+a+doctor (visited May 31, 2022).

[10] "Extreme limitations" were specifically defined on the form as "There is major limitation in this area. There is no useful ability to function in this area." R. 738. The Social Security Administration defines "extreme limitations" this way:

> We will find that you have an extreme limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be very seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. Extreme limitation also means a limitation that is more than marked. Extreme limitation is the rating we give to the worst limitations. However, extreme limitation does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean."

DI 25225.020 How We Define Marked and Extreme Limitations (Section 416.926a(e)), SSA POMS DI 25225.020.
Appendix 1, Part A2 to Subpart P of Part 404 of the Code of Federal Regulations, Section 12.00 Mental Disorders, advises that if a claimant's mental disorder results in a single "extreme" limitation under Paragraph B of each listing, the criteria for that paragraph are satisfied.

> Paragraph B of each listing (except 12.05 [intellectual disorders]) provides the functional criteria we assess, in conjunction with a rating scale (see 12.00E and 12.00F), to evaluate how your mental disorder limits your functioning. These criteria represent the areas of mental functioning a person uses in a work setting. They are: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. We will determine the degree to which your medically determinable mental impairment affects the four areas of mental functioning and your ability to function independently, appropriately, effectively, and on a sustained basis (see §§ 404.1520a(c)(2) and 416.920a(c)(2) of this chapter). To satisfy the paragraph B criteria, your mental disorder must result in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning. (When we refer to "paragraph B criteria" or "area[s] of mental functioning" in the introductory text of this body system, we mean the criteria in paragraph B of every listing except 12.05).

20 C.F.R. § Pt. 404, Subpt. P, App. 1.

1.     <u>Understanding and memory</u>

- The ability to understand and remember detailed instructions.[11]

2.     <u>Sustained Concentration & Persistence</u>

- The ability to maintain attention and concentration for <u>extended</u> periods. (Emphasis in original for all underlined language).

- The ability to complete a <u>normal workday</u> without interruptions from psychologically based symptoms.

- The ability to complete a <u>normal workweek</u> without interruptions from psychologically based symptoms.

- The ability to perform at a consistent pace with a standard number and length of rest periods.

3.     <u>Social Interaction</u>

- The ability to accept instructions and respond appropriately to criticism from supervisors.

4.     <u>Adaptation</u>

- The ability to travel to unfamiliar places or use public transportation.

- The ability to set realistic goals or make plans independently of others.

R. 738-39.

Dr. Stern also opined that Ms. Blackman had "marked" limitations[12] in the following areas:

1.     <u>Understanding and memory</u>

---

[11] Dr. Stern checked both "marked" and "extreme" for this category.

[12] "Marked limitations" were specifically defined on the form as "There is serious limitation in this area. The individual cannot generally perform satisfactorily in this area." R. 738.

- The ability to remember locations and work-like procedures.

- The ability to understand and remember detailed instructions.

2.   <u>Sustained Concentration & Persistence</u>

- The ability to carry out detailed instructions.

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.

- The ability to work in coordination with or in proximity to others without being distracted by them.

- The ability to make simple work-related decisions.

3.   <u>Social Interaction</u>

- The ability to ask simple questions or request assistance.

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.

4.   <u>Adaptation</u>

- The ability to respond appopriately to changes in the work setting.

- The ability to be aware of normal hazards and take appropriate precautions.

*Id.*

After each category, Dr. Stern handwrote her medical findings to support each category. For "understanding and memory," Dr. Stern wrote, "[t]here is variation, some days better than others. She is often very overwhelmed and confused." R. 738. Dr. Stern's findings supporting the marked and extreme limitations in sustained concentration and persistence were that Ms. Blackman, "often needs repitition of

instructions, gets overwhelmed, and irritable." R. 739. Ms. Blackman's social interactions are limited because, "she becomes irritable and is not always able to resolve issues that might arise." *Id*. Finally, Dr. Stern's findings regarding Ms. Blackman's ability to adapt were that, "[t]raveling is <u>very</u> difficult for her. Cannot go to new places." R. 740 (emphasis in original).

In evaluating Dr. Stern's opinion, the ALJ wrote only that, '[a]lthough Dr. Stern is the claimant's treating psychotherapist, and she had an opportunity to evaluate the claimant, her opinion is not supported by any treatment notes." R. 41. (Citations to the record discussed *infra*). "Her rationale, that the claimant is often irritable, overwhelmed, and confused is not consistent with the evidence as a whole. In particular, while the claimant was confused on how to navigate around the city and was frustrated with her pain and her GPS,[13] she is regularly noted to be cooperative, with appropriate affect, intact memory, and fair concentration." *Id*. (Citations to the record discussed *infra*).

Because there is no further discussion by the ALJ of her reasons for rejecting Dr. Stern's opinion, and because I must review the opinion as a whole, I will take the time to examine the record cites that are noted by the ALJ as her reason for finding Dr. Stern's opinion "not consistent with the evidence as a whole."

The ALJ cites to three locations in the record for the first reason she rejects Dr. Stern's opinion, (that is, that the record does not contain Dr. Stern's treatment notes)—B8F; B10F; and 16F/19. These citations correspond to R. 564-625, (B8F), which are extensive treatment notes of Dr. Withington; R. 646-705 (B10F), which are additional

---

[13] The reference to a "GPS" is perplexing. I saw no reference to one in the medical records.

records from The Family Practice and Counseling Network, Abbottsford Falls Family Practice and Counseling, which is the practice where both Dr. Withington and Dr. Stern are located; and R. 765, (16F/9, presumably a reference to *B*16F, p. 9), which is just the first page of the Mental Capacity Assessment prepared by Dr. Withington. It is true that none of these exhibits contain any of Dr. Stern's treatment notes, and presumably, were cited for that reason.

The ALJ's reliance on Dr. Stern's decision not to include her therapy notes in the record, as a reason to reject her opinion, was error. The Social Security Administration does not require a psychotherapist to provide such notes in order for the opinion to be valid evidence of a claimant's impairments.

> Social Security recognizes the sensitivity and extra legal protections that concern psychotherapy notes (also called "process" or "session" notes) and does not need the notes. As HIPAA defines the term, "psychotherapy notes means notes recorded in any medium by a mental health professional documenting or analyzing the contents of conversation during a private counseling session or a group, joint, or family counseling session and that are separated from the rest of the individual's medical record. Psychotherapy notes excludes medication prescription and monitoring, counseling session start and stop times, the modalities and frequencies of treatment furnished, results of clinical tests, and any summary of the following items: diagnosis, functional status, the treatment plan, symptoms, prognosis, and progress to date."

> If you keep psychotherapy notes separate from your other medical records, you can send the set of records without the psychotherapy notes. If you do not keep psychotherapy notes separate from other parts of the medical records, you can legally disclose all of the records. However, you can choose to black out or remove the parts of the records that would be considered psychotherapy notes if kept separately. Another option is to prepare a special report detailing the critical current and longitudinal aspects of your patient's treatment and their functional status.

Fact Sheet for Mental Health Care Professionals: Supporting Individuals' Social Security Disability Claims, (footnote omitted),

https://www.ssa.gov/disability/professionals/mentalhealthproffacts.htm (visited on May 19, 2022).

Dr. Stern followed this procedure, providing "medication prescription and monitoring, counseling session start and stop times, the modalities and frequencies of treatment furnished, results of clinical tests, and any summary of the following items: diagnosis, functional status, the treatment plan, symptoms, prognosis, and progress to date," while omitting her notes of the weekly psychotherapy sessions conducted with Ms. Blackman. *See, e.g.* R. 759-60, Service log records of Ms. Blackman's appointments with Dr. Stern.

The second set of citations, to Exhibits B6F, B9F, B15F, and B16F, apparently refer to the places in the record that the ALJ believes are "inconsistent" with Dr. Stern's findings. ("Her [Dr. Stern's] rationale . . .  is not consistent with the evidence as a whole." R. 41). I will examine each in turn.

Exhibit B6F [R. 546-54] is the Mental Status Evaluation of Dr. John Laurence Miller, Ph.D., performed on December 10, 2018.[14] That date was the only time Dr. Miller ever saw Ms. Blackman. Dr. Miller's report states that he had received no records prior to his examination of Ms. Blackman. R. 547. While Dr. Miller stated that Ms. Blackman was "cooperative" in demeanor, her speech was rapid and pressured. She had "no evidence of hallucinations, delusions, or paranoia *in the evaluation setting*," but reported waking up an average of four times per night, "sometimes because of voices or other times because of nightmares." R. 548, 49. (Emphasis added). Dr. Miller reported

---

[14] Dr. Miller's evaluation thus predates Dr. Stern's July 2019 opinion by almost eight months. Dr. Stern began treating Ms. Blackman about five weeks before Dr. Miller conducted his consultative examination.

Ms. Blackman's affect as "dysphoric,"[15] and her mood as "dysthymic."[16] Dr. Miller reported Ms. Blackman's attention and concentration and recent and remote memory skills as "intact," and her cognitive functioning as "average." R. 549-50. Her insight and judgment, however, he listed as only "fair," and he diagnosed Ms. Blackman with Bipolar I disorder with anxious distress. R. 550. Dr. Miller listed her "mode of living" as including the basics of dressing, bathing, grooming herself, cooking and cleaning. *Id*. Dr. Miller stated in the same section, however, that Ms. Blackman's daughter must do the laundry, and assists Ms. Blackman in managing her money. He reported that Ms. Blackman does not take public transportation and has just one friend, no hobbies, and spends her day watching television, listening to the radio, reading, and "socializing with friends." *Id*. Dr. Miller opined that Ms. Blackman's prognosis was "fair" if she remained in treatment, which consisted at the time of the monthly examination visits with Dr. Withington and weekly therapy sessions with Dr. Stern.

On a "check box" form, Dr. Miller listed Ms. Blackman has having moderate difficulties in interacting appropriately with the public, supervisors, and co-workers in a work setting, and responding appropriately to usual work situations and to changes in routine in the work setting. R. 553. He listed her social anxiety, depression, and mood swings as the factors supporting this assessment. *Id*. He advised that her impaired ability to cope with stress, her ability to concentrate, persist, or maintain pace and her ability to adapt or manage herself are affected by her impairments. *Id*. Finally, Dr. Miller

---

[15] "Dysphoric" is defined in Merriam Webster's dictionary as "very unhappy, uneasy, or dissatisfied: marked or characterized by dysphoria," https://www.merriam-webster.com/dictionary/dysphoric.

[16] Likewise, Merriam Webster's dictionary defines "dysthymia" as "a mood disorder characterized by chronic mildly depressed or irritable mood often accompanied by other symptoms (such as eating and sleeping disturbances, fatigue, and poor self-esteem). https://www.merriam-webster.com/dictionary/dysthymia. (Visited on June 8, 2022).

listed "hallucinations" and "nightmares" as "the particular medical signs, laboratory findings, or other factors" that support his assessment.

Strictly speaking, Dr. Miller's report does document that Ms. Blackman was, on the date of the examination, "cooperative, with appropriate affect, intact memory, and fair concentration," during his evaluation, as stated by the ALJ in her decision. R. 41. And while there are some findings in Dr. Miller's report that contradict some of the extreme limitations documented by Dr. Withington and Dr. Stern, (*see* R. 549, 552), several of his findings do support those documented nearly a year later by Ms. Blackman's treating physicians. Read as a whole, it is difficult to see how Dr. Miller's findings are "not consistent" with Dr. Stern's documentation that Ms. Blackman is "often irritable, overwhelmed, and confused." R. 41.[17] In fact, Dr. Miller's report does little to address any of these, with the exception of his documentation that Ms. Blackman can count by "3's" and "7's," and can recall two out of a list of three objects. R. 549.

Exhibit B9F (R. 627-45) are the records from Wedge Recovery Centers, and document Ms. Blackman's enrollment in their progam from April 11, 2017 through July 23, 2018. Several "check box" forms are confusing, in the sense that multiple boxes are checked, as in a form for May 16, 2018, which notes in the "Memory" column both "immediate-intact," and "immediate-impaired." R. 627, 632. For all intents and purposes, this makes the form useless in determining whether or not Wedge's findings agree with those of Dr. Stern that Ms. Blackman has memory problems as a result of her

---

[17] Indeed, it is difficult to imagine how any doctor, performing a one-time patient evaluation, could ever document that an individual is "often irritable, overwhelmed, and confused," unless the doctor simply reports that the person tells him or her that such is the case. In Dr. Miller's examination, if that particular question was asked, the answer was not documented.

mental impairments. Wedge physicians consistently diagnosed Ms. Blackman with recurrent major depressive disorder and Bipolar 1 disorder. R. 628, 633, 637. Her assessment and plan consistently noted minimal improvement. R. 629, 634. Upon discharge in July 2018, against medical advice, her prognosis was poor, her motivation was poor, and her medication compliance was only fair. R. 638. There is a single treatment plan update in the records, dated February 21, 2018. R. 642-44. For Ms. Blackman's first goal-to reduce her mental health symptoms to once per month with an intensity level of one (out of a 1-10 scale), the note states:

> The therapist and Rhonda agreed that no progress occurred within this treatment plan period. Rhonda states that she continues to experience mood disturbance due to her marriage and the responsibilities of her family. Rhonda explains that she is willing to work on her marriage and the relationship with her children.

R. 642.

Goal #2 was to "reduce her anxiety symptoms to once month (sic) with an intensity level of 1 out of ten. Again the note recorded no progress:

> The therapist and Rhonda agreed that no progress occurred during this treatment plan period. Rhonda states that she has move quickly (sic) and that has caused some extra stress and anxiety. Rhonda mentions that she has the support of her husband but struggles practicing healthy self care behaviors.

*Id*. The "new goals and objectives" section of the report advised that:

> Rhonda reports symptoms of anxiety that are moderate to severe and occur daily, including racing thoughts, feelings of worry, and difficulty focusing. Her anxiety has increased lately and she feels she has little control over her racing thoughts. Rhonda reports experiencing anxiety symptoms on a daily basis with an intensity level of 7 out of 10.

R. 643. Obstacles to her treatment were listed as limited supports and limited coping skills. *Id*. During the time Ms. Blackman was treated at Wedge, she was prescribed

Cymbalta, and its generic form, duloxetine, (used to treat depression), and Lamotrigine (brand name Lamictal, used to treat epilepsy and bipolar disorder). R. 637.[18]

Like the records for Dr. Stern, there are no therapy notes contained in the Wedge records.[19] The records also are devoid of any opinion reports from doctors at Wedge. While the records therefore do not document "extreme" or "marked" limitations in specific categories, the findings with respect to Ms. Blackman's diagnosis of major, recurrent depressive disorder and Bipolar I disorder are consistent with the records of Drs. Withington and Stern. Likewise, they document the necessity for medication, in addition to the weekly therapy sessions which were discontinued by Ms. Blackman against the advice of the Wedge physicians. Ms. Blackman and the Wedge doctors were in agreement that she was making no progress toward her goals of relieving her anxiety, racing thoughts, and inability to handle the stresses in her life.

The inclusion by the ALJ of "B15F" as records which support her rejection of Dr. Stern's opinion due to "inconsistency," is even less understandable, given that B15F (R. 744-756), are records from the Family Practice and Counseling Network, including the "Service Log" documenting Ms. Blackman's weekly appointments with Dr. Stern, (R. 744-45), her medication log, (R. 746-47),[20] detailed notes from Dr. Withington, (R. 748-51), and a "comprehensive biopsychosocial evaluation" form, signed by Dr. Stern (R. 752-54). Virtually all of these records support Dr. Stern's findings.

---

[18] Medication logs from FamilyPractice and Counseling Network (Dr. Withington) confirm that Ms. Blackman remained on these medications during her treatment with Drs. Stern and Withington. R. 761-62.

[19] The irony is not lost on me that the ALJ used records that do not include therapy notes to discount a doctor's opinion, in part because it did not contain therapy notes.

[20] Ms. Blackman continued taking Lamotrigine and Duloxetine while receiving treatment at Family Practice and Counseling Network, with Dr. Withington prescribing those medications. *Id.*

Turning first to the evaluation completed by Dr. Stern, (R. 752-54), the document is replete with information supporting Dr. Stern's later opinion (the form is dated November 13, 2018, while her opinion was prepared in July 2019). Dr. Stern states that Ms.  Blackman:

- Is affable and friendly, and able to describe traumatic events, *but her affect is not appropriate to her expressed thought content*. (Emphasis added);

- Suffers from multiple stressors including family pressures resulting from her mother having "made a mess" of her parents' estate, leaving bills unpaid and a house in disrepair;

- Grew up in a home with an abusive mother who brought multiple men into the home, who also abused the children;

- Suffers from anxiety and depression. During stressful episodes, she decompensates, reporting auditory hallucinations that say unkind things and at times suggest that she kill herself. She learned to cope with the hallucinations by "over-functioning," and being "obsessive-compulsive";

- Is amenable to therapy, and is very bright.

Dr. Stern recommended individual weekly psychotherapy sessions and psychiatric evaluation for potential utilization of medications. R. 752-53.

Exhibit B15F also contains detailed notes of Dr. Withington dated December 13, 2018, in which Dr. Withington documented Ms. Blackman's severe sleep issues, her experiences of auditory hallucinations at night, and panic attacks. R. 748. The notes recount that Ms. Blackman reports frequently waking up with headaches, and that she

suffers from migraines that affect her vision and interfere with her ability to drive. *Id*. Dr. Withington's report of December 13, 2018 documented Ms. Blackman's appearance as appropriate and her speech as clear, but her mood was anxious and depressed, her affect was constricted, her thought processes included hallucinations and paranoid and obsessive thoughts, her attention was "variable." R. 750. Dr. Withington wrote a significant amount of margin notes in this portion of the report, the majority of which are illegible. *Id*. In the suicide risk assessment, Dr. Withington checked "denies," and "no evidence," but wrote that, "she denies suicidal ideation, has never made an attempt. She resists voices telling her to harm herself. She wants to live for her children and her faith is against it." R. 751. Dr. Withington diagnosed depressive disorder, recurrent, severe, with psychotic features, PTSD, and possible obstructive sleep apnea. *Id*.

Finally, Exhibit B16F consists of 47 pages of additional records from The Family Practice & Counseling Network. R. 757-803. They begin with a two page letter from Dr. Withington, stating that she is "submitting this summary of several years' treatment, in support of Rhonda's application for Social Security Disability Benefits. *Due to a combination of her physical and psychiatric symptoms, she is not able to sustain full time employment*. R. 757 (Emphasis added).[21] Dr. Withington listed Ms. Blackman's current diagnoses as of August 8, 2019, as:

- Depressive disorder, major, recurrent, severe, with psychotic features

- Post traumatic stress disorder

- Multiple incidents of head trauma with loss of consciousness

---

[21] I acknowledge that it is the ALJ, not the treating doctor, who makes the final determination as to disability. Nevertheless, the doctor who treated Ms. Blackman on a monthly basis for over a year was willing to put in writing her belief that Ms. Blackman cannot handle the rigors of full-time work. Certainly this statement does not undercut that doctor's medical opinion.

- Ophthalmic migraine headaches

- Primary generalized osteoarthritis

- Spasms of lower back

- Muscle weakness

- Gastro-esophageal reflux disease

- Liver cyst

- Cyst of kidney

- Episodes of microscopic hematuria.

R. 757.

Dr. Withington concluded her letter with the following two paragraphs:

I am also attaching my psychiatric evaluation and progress notes, which document that, despite her efforts to remain gainfully employed, she continues to have physical deterioration, with exacerbation of her mental health symptoms. Her attorneys requested that functional capacity assessments be completed, and I am enclosing copies of them here as well.

Due to her numerous chronic physical and psychiatric limitations, it is my medical opinion that she is not able to sustain employment at a level which can support herself, let alone any dependent family members. If further information is desired, please contact me at the office indicated in the left hand column of this letter.

R. 758.

The records include progress notes from Dr. Withington that document anxious and irritable mood, hopeless and helpless thought process, and auditory hallucinations on July 22, 2019. R. 763. On June 24, 2019, the doctor noted distractible attention, writing in the margin, "loses train of thought when shifting position due to pain." R. 764. For "appearance," Dr. Withington checked "other" and noted that Ms. Blackman told her she "put on clothes I can pull over, no buttons or zippers unless someone can

24

help me." *Id*. Ms. Blackman expressed thought processes of "helplessness" and "hopelessness," with a note that "I can't count on my strength to hold out." *Id*. On this date Ms. Blackman reported that she was being let go from her job because, "they're worried that I'll hurt myself and may be a liability." *Id*. Dr. Withington's mental Capacity Assessment, contained as part of B16F at R. 765-67, contain a mix of "marked" and "extreme" findings that were similar to those of Dr. Stern. Dr. Withington's assessment is dated June 24, 2019.

Progress notes for May 9, 2019 are similar to the June and July reports, finding Ms. Blackman cooperative, but with mood, affect, and thought process issues. R. 768. On this date Dr. Withington also noted "no evidence of abnormality" in perception, writing "today" underneath the checked box, and recording that Ms. Blackman had experienced auditory hallucinations "at work." *Id*. As was the case on other dates, the notes included a mix of psychiatric and physical issues, on May 9 discussing the fact that Ms. Blackman was experiencing weakening in her knees. *Id*. On April 11, 2019, Ms. Blackman was cooperative but anxious and tearful. R. 769. On February 14, 2019, she was anxious, irritable, with a tearful affect, and slowed speech. R. 771. An undated form at R. 773 also noted anxious and depressed mood, constricted affect, and paranoid and obsessive thought processes.

Exhibit B16F also contains a physical assessment, completed by Dr. Withington as the Medical Director of the facility. It makes various adverse physical findings with respect to Ms. Blackman's ability to stand, walk, or sit on a continuous basis during a regular work day. R. 778. A typed report from a nurse practitioner dated June 25, 2018, noted neat appearance, alert and oriented "x3," but with only "adequate" insight and judgment, sad mood, affect depressed or sad, and tearful. R. 784. At an office visit on

June 11, 2018 with the same nurse practitioner, Ms. Blackman advised that she was getting outpatient behavioral health treatment at the Wedge for two years, "but pt stated 'we aren't getting any better.'" R. 786. She was "depressed and tearful" during the visit. *Id*. Notes from a visit two years earlier, on June 14, 2016, record Ms. Blackman's "'long history' of depression," and "endorses the following symptoms; irritability, crying spells, difficulty with sleep, decrease in appetite, and isolation." R. 799. Her "mood and affect are stable at this time." The Nurse Practitioner recorded that she discussed "connecting with BH services and talked about depression and medication and pt was receptive." *Id*.

Given the general thrust of these records, that is, that Ms. Blackman has a long-standing, well-documented history of serious mental health issues, I find it impossible to evaluate the ALJ's cursory dismissal of Dr. Stern's opinion as "inconsistent," without further explanation of her reasoning. In fact, my overall review of these records indicate that they are, in fact, consistent with Dr. Stern's findings.

As noted by the Plaintiff in her opening brief, the ALJ only contends that Dr. Stern's opinion is inconsistent with the record as a whole because "she is regularly noted to be cooperative, with appropriate affect, intact memory, and fair concentration." Pl. Br. at 10. "The ALJ has failed to show how having appropriate affect is related to a *marked* limitation in performing activities within a schedule and maintaining regular attendance." *Id*., citing to R. 41. I agree. A claimant may be capable of some activities of daily living, without contradicting the opinion of a treating mental health specialist that she suffers from a work-preclusive mental impairment. *See Bauer v. Astrue*, 532 F.3d

606, 608-09 (7th Cir. 2008).[22] Like the plaintiff in *Bauer*, Ms. Blackman can perform some functions of daily living, but needs assistance with chores as simple as dressing and cooking, and her daughter assists her with maintaining her finances. Her treating doctor, familiar with both Ms. Blackman's physical and mental challenges, believes Ms. Blackman incapable of handling full-time employment. Combined with the ALJ's other reason for dismissing Dr. Stern's opinion—that her treatment notes were not included in the record, a reason not valid under Social Security's own rules—I must conclude that a remand is required because the ALJ did not substantiate her rejection of the opinion, since the records she cites do support, and are largely consistent with, Dr. Stern's findings. I am unable to meaningfully review the ALJ's decision because she failed "to consider and explain [her] reasons for discounting all of the pertinent evidence before [her] in making [her] residual functional capacity determination . . .", *Burnett*, 220 F.3d at 121.

### 2.    Amelia Withington, M.D.

The ALJ also chose to reject the opinion of Dr. Withington, Ms. Blackman's treating psychiatrist, stating the following:

---

[22] While not precedential in the Third Circuit, the circumstances of the Seventh Circuit's decision in *Bauer* are strikingly similar to those presented here, making Judge Posner's words recommended reading:

> Many of the reasons offered by the administrative law judge for discounting the evidence of Drs. Caspary and Chucka suggest a lack of acquaintance with bipolar disorder. For example, the judge noted that the plaintiff dresses appropriately, shops for food, prepares meals and performs other household chores, is an "active participator [*sic*] in group therapy," is "independent in her personal hygiene," and takes care of her 13–year–old son. This is just to say that the plaintiff is not a raving maniac who needs to be locked up. She is heavily medicated, and this enables her to cope with the challenges of daily living, and would doubtless enable her to work on some days. But the administrative law judge disregarded uncontradicted evidence that the plaintiff's son cooks most meals, washes the dishes, does the laundry, and helps with the grocery shopping. And Caspary and Chucka, having treated the plaintiff continuously for three years, have concluded that she cannot hold down a full-time job.

*Bauer v. Astrue*, 532 F.3d 606, 608–09 (7th Cir. 2008). *See also Cordero v. Kijakazi*, No. 20-CV-01868-RAL, 2022 WL 1052681, at *16 (E.D. Pa. Apr. 4, 2022).

This opinion is not persuasive. Although Dr. Withington had an opportunity to evaluate the claimant over 6 months, her opinion is not consistent with the evidence. While Dr. Withingon provides that the claimant is significantly limited in her ability to concentrate, follow instructions, use judgment, make plans, respond to others, distinguish between acceptable work performance, etc., this is contradicted by Dr. Withington's own treatment records documenting the claimant's fair memory, normal insight and judgment, appropriate affect, and cooperative behavior (Exhibits B8F, B16F). In fact, only on twice [sic] did the claimant present to session as distractible, and at all other times, her concentration skills were normal (Exhibits B15F/5, B16F/8; see also Exhibits B5F/6, 23, 60, 81; B6F/4; B8F/10, 13, 26, 42, 45; B15F/7; B16F/7, 12, 13, 15, 39).[23] This opinion is also not adequately supported; Dr. Withington's opinion explanation is wrought with actual statements that the claimant made, therefore relying too heavily on the claimant's subjective reports. Such limitations are contradicted by the claimant's admitted activities of daily living, including the claimant's ability to perform household chores, run errands, manage a household, work as a cleaner, babysit her grandchild, and raise her young son (Exhibits B4E; B6F/5; B16F/12, 13, 15; Testimony).

R. 42.[24]

---

[23] Without reviewing each record cite, I will note here that I do not agree that this string of citations to the record support the conclusion that Ms. Blackman's "concentration skills were normal." For example, the record cites to "B5F" are to records of visits for physical problems such as back pain and high blood pressure. B6F is Dr. Miller's report, which, on the cited record page (R. 549), records cooperative demeanor, and also rapid and pressured speech, dysphoric affect, dysthymic mood, and no evidence of hallucinations or delusions in the evaluation setting. On the previous page, Dr. Miller documented Ms. Blackman's recurring auditory hallucinations, along with recurrent depressive episodes punctuated by dysphoric mood, crying spells, feelings of hopelessness, irritability, fatigue, concentration difficulties, social withdrawal, isolation, and recurrent thoughts of suicide. R. 548. Any or all of these factors may have an affect on one's "concentration skills" on a given day. B8F are again records from physical examinations, in which examining doctors or nurse practitioners noted in the course of their overall examination, (General; Head; Eyes; etc.), under "Psych:" the standard language: "alert and cooperative; normal mood and affect; normal attention span and concentration." *See e.g.*, R. 589. Given my detailed discussion above with regard to Dr. Stern, I see no reason to expound further on each record cite here. The fact that a physician treating someone for back pain does not take the time to discuss and document psychiatric issues is not evidence sufficient to discount the opinion of a psychiatrist who does treat such impairments.

[24] I am reminded of the discussion between Yossarian and Doc Daneeka in Joseph Heller's *Catch-22*:
   There was only one catch and that was Catch-22, which specified that a concern for one's safety in the face of dangers that were real and immediate was the process of a rational mind. Orr was crazy and could be grounded. All he had to do was ask; and as soon as he did, he would no longer be crazy and would have to fly more missions. Orr would be crazy to fly more missions and sane if he didn't, but if he was sane he had to fly them. If he flew them he was crazy and didn't have to; but if he didn't want to he was sane and had to. Yossarian was moved very deeply by the absolute simplicity of this clause of Catch-22 and let out a respectful whistle. 'That's some catch, that Catch-22,' he observed. 'It's the best there is,' Doc Daneeka agreed.

To summarize for purposes of discussion, the ALJ finds three faults with Dr. Withington's opinion: (1) the doctor's opinion is not consistent with the record; (2) the opinion is not adequately supported because it relies too heavily on statements made by the Plaintiff to her doctor during treatment; and (3) Ms. Blackman's stated limitations are contradicted by her statements that she performs some activities of daily living.

As Ms. Blackman appropriately argues in her brief, "[t]he ALJ failed to consider the fact that Dr. Withington supported her opinion, not only with a summary letter, but also with numerous, detailed treatment notes that support her opinion." Pl. Br. at 11. While the ALJ does make several references to Dr. Withington's notes in her explanation of why they were rejected, the ALJ discusses only Dr. Withington's *positive* findings, regarding Ms. Blackman's appropriate affect and cooperative behavior, along with "fair" memory and insight, while ignoring significant *negative* findings concerning Ms. Blackman's long-standing issues with auditory hallucinations, sleep disturbances, constricted affect, paranoia, obsessive thoughts, and depression. *See e.g.*, R. 748-50, 764, 768, 769. As pointed out in Plaintiff's brief, these findings were consistent with findings of Dr. Jiwesh Jha, Psy.D., Ms. Blackman's previous doctor at The Wedge. Pl. Br. at 12, citing to R. 629, 634, 638, 642-43, 714, 717, 722, 724. This failure to discuss negative findings, while relying upon positive findings, is a classic "cherry pick," and an inappropriate basis upon which to wholesale reject a medical opinion.[25] The failure to

---

*Catch-22: 50th Anniversary Edition*, by Joseph Heller, p. 46. Copyright 1955, 1961, Copyright renewed 1989.

[25] "Cherry-picking" is a term used to describe selective citation of the record to support an opinion that is not supported by a fair and complete review of the entire record. *See Smith v. Berryhill*, No. 17-2661, 2018 WL 7048069, at *9 (E.D. Pa. Nov. 27, 2018) (Hey, MJ) (collecting cases). *See also Rosa v. Berryhill*, No. 16-5923, 2018 WL 1442893 (E.D. Pa. Jan. 31, 2018) (Lloret, MJ), *report and recommendation adopted*, No. 16-5923, 2018 WL 1426964 (E.D. Pa. Mar. 22, 2018) (Robreno, J), *Cordero v. Kijakazi*, No. 20-CV-01868-RAL, 2022 WL 1052681, at *29 (E.D. Pa. Apr. 4, 2022).

grapple with evidence that contradicts the ALJ's findings leaves me unable to perform a meaningful review of the ALJ's decision. *Burnett*, 220 F.3d at 121. I also reject the ALJ's dismissal of Dr. Withington's opinion because it "rel[ies] too heavily on claimant's subjective reports." R. 42. Mental impairments such as depression and anxiety are largely diagnosed solely or primarily on the basis of a patient's subjective complaints. *Schickel v. Colvin*, No. 14-CV-5763, 2015 WL 8481964, at *11 N.D. Ill. Dec. 10, 2015); *Hall v. Astrue*, 882 F.Supp.2d 732, 740 (D. Del. 2012); *Lex v. Berryhill*, No. 3:17-CV-2204, 2018 WL 4212413 (M.D. Pa. Sept. 4, 2018).

The importance of recognizing difficulties in ascertaining the severity of a mental health impairment was discussed in *Frye v. Berryhill*, Civ. A. No. 3:16-CV-1482, 2017 WL 4387060 (M.D. Pa. Oct. 3, 2017).

> Mental impairments such as depression and anxiety ... may manifest in symptoms difficult to quantify through objective medical evidence. A lack of objective medical evidence is by itself insufficient to discredit [a] claimant. SSR 96-7p. As noted by other courts in the Third Circuit, impairments such as depression and anxiety "while medically determinable, are difficult to substantiate by objective medical evidence." *Volage v. Astrue*, No. 11-CV-4413, 2012 WL 4742373, at *7 (D.N.J. Oct. 1, 2012). "[T]he reports of treating physicians, as well as testimony by the claimant, become even more important in the calculus for making a disability determination" in circumstances involving impairments for which objective medical testing may not demonstrate the existence or severity of an impairment. See *Perl v. Barnhart*, No. 03-4580, 2005 WL 579879, at *3 (E.D. Pa. March 10, 2005) (citing *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2002) ). Thus, credibility becomes paramount in making the disability determination without objective medical evidence to refute the findings of a treating source.

*Frye*, 2017 WL 4387060, at *4.

The decision in *Lex* predates the change in the rules for ALJs' discussion of medical opinions, however, Judge Conaboy's statement with regard to the handling of

treating versus non-treating *opinions*, in cases involving mental impairments, is still instructive:

> Finally, the importance of subjective complaints related to mental impairments and difficulty quantifying these impairments through objective medical evidence indicates that non-examining source opinions should be carefully considered when an ALJ relies on such an opinion to discount a treating source opinion. Important considerations are the degree to which the non-examining source provides supporting explanations for the opinion and the degree to which the source considers all pertinent evidence, including opinions of treating and examining sources. 20 C.F.R. § 416.927(c)(3); *see also Blum v. Berryhill*, Civ. A. No. 3:16-CV-2281, 2017 WL 2463170, at *7-9 (M.D. Pa. June 7, 2017).

*Lex*, 2018 WL 4212413, at *8.

Here, the ALJ relies primarily on the opinions of consulting doctors Miller, M.D. and Melissa Franks, Psy.D. Dr. Miller, whose findings are less restrictive than the findings of the treating doctors, reviewed no "pertinent evidence," that is, no records and no other opinions, and met with Ms. Blackman on a single occasion. R. 547-51. Dr. Franks, the state agency psychologist, did have the report of Dr. Miller, and medical records from Temple University, Einstein Practice Plan, Resources for Human Development, and from the Plaintiff. R. 93-6. Her report does not indicate that she had any of the records from Drs. Stern and Withington, however, although their treatment did begin prior to December 2018. She clearly did not have their opinions, as her own report recites that she has no medical opinions about the individual's abilities and limitations that are more restrictive than her findings. R. 103. And it does not appear from the record that Dr. Franks ever met with Ms. Blackman.

Nor does the ALJ's opinion account for the fact that the records of the treating doctors document that Ms. Blackman's impairments are better or worse on any given

day. R. 738. Waxing and waning of mental impairments is common, and affects a claimant's ability to handle full-time employment. A doctor's assessment of a patient's affect, memory, or ability to concentrate during a single encounter, therefore, may not be a good gauge of her "ability to function in a work setting." *Brownawell*, 554 F.3d at 356. The ALJ gives me no guidance in her opinion as to whether she considered this reality in accepting the agency consultants' opinions while rejecting those of the treating doctors.

Plaintiff also appropriately takes issue with the ALJ's final reason for rejecting Dr. Withington's opinion, that is, Ms. Blackman's supposed ability to perform "household chores, run errands, manage a household, work as a cleaner, babysit her grandchild, and raise her young son." R. 42. None of these are significant reasons for rejecting Dr. Withington's opinion. First, as Plaintiff points out in her brief, Ms. Blackman's "work as a cleaner," her final employment documented in the record, did not rise to the level of substantial gainful activity, earning her just $1,738 in 2019. R. 31. *See* Pl. Br. at 14. I agree with the Plaintiff that this fact does more to prove, than to disprove, Ms. Blackman's inability to maintain steady employment. Second, the fact that Ms. Blackman may be able to handle some household chores, or run some errands, or participate in the management of her household, only faintly – if at all - disproves her significant mental impairments, and their effect on her ability to maintain full-time employment.

> The Third Circuit has repeatedly reaffirmed that activities of daily living which do not indicate transferable job skills for a regular and continuing basis cannot be used as substantive evidence of non-disability. *Smith v. Califano*, 637 F.2d 968, 971–72 (3d Cir. 1981) ("Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity .... It is well established that sporadic or transitory activity does not disprove

disability"); *Kangas v. Bowen*, 823 F.2d 775, 778 (3d Cir. 1987); *Fargnoli v. Massanari*, 247 F.3d 34, 44 (3d Cir. 2001) ("Fargnoli's trip to Europe in 1988 cannot be the basis for a finding that he is capable of doing a light exertional job because sporadic and transitory activities cannot be used to show an ability to engage in substantial gainful activity.") (internal citations omitted).

*Gonzales v. Colvin*, 191 F. Supp. 3d 401, 423 (M.D. Pa. 2015). While it is not error *per se* to rely on the capacity to do some household chores as proof of a claimant's ability to hold down a full time job, the probative value of this type of evidence usually is a hair's breadth from zero. Perhaps if the household chores involved chopping firewood or drawing water from an outdoor well they would weigh more in the calculus. This record documents that Ms. Blackman needs assistance dressing herself (if the clothing requires anything more than placing it over her head), handling the cooking, handling the finances, and running any errands that involve public transportation. In stating that Ms. Blackman could handle such activities, the ALJ made no attempt to analyze how the ability to handle some activities involved in her own personal care and the management of her living environment supported a conclusion that Ms. Blackman could therefore handle the rigors of 40-hour per week employment. The opinion is also devoid of any mention of how the ability to do some housework disproved Dr. Withington's (and Dr. Stern's) opinion that Ms. Blackman could not handle employment.

The remaining two activities listed by the ALJ as reasons to reject Dr. Withington's opinion (Ms. Blackman's occasional babysitting of her grandchild and raising her own son), again without explanation of how these activities refute Dr. Withington's opinion, are insufficient support for the ALJ's ultimate conclusion.

The ability to care for one's children may be used "to discount credibility if it contradicts a claimant's limitations or symptoms." *Gonzales*, 191 F. Supp. 3d at 425; *see*

*also Rutherford v. Barnhart*, 399 F.3d 546, 555 (3d Cir. 2005) (concluding that the ALJ's decision to discount claimed side effects of drowsiness based on inconsistencies in the record, including testimony that claimant cared for her child and grandchild, was supported by substantial evidence). However, "[t]he ability to care for children, alone, does not inherently indicate that a claimant possesses the ability to perform on a regular and continuing basis in a work setting." *Gonzales*, 191 F. Supp. 3d at 424; *see also Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) (rejecting the significance the ALJ attached to child care because the claimant "must take care of her children, or else abandon them to foster care or perhaps her sister, and the choice may impel her to heroic efforts.").

### B. The ALJ's consideration of Dr. Withington's physical assessment, and her failure to include the use of a cane in the RFC, do not provide an adequate basis for remand on their own.

Because I will remand the case on the basis of the ALJ's failure to adequately explain her reasoning for finding Drs. Miller and Frank's opinions supportable while rejecting Drs. Stern and Withington as unsupportable, it is unnecessary for me to rule on Plaintiff's other arguments. I have reviewed the Plaintiff's second claim, that the ALJ's RFC determination is not supported by substantial evidence because she failed to properly evaluate the physical opinion evidence of Dr. Withington, conduct a function-by-function analysis and incorporate the use of a cane into the RFC. Pl. Br. at 16-19. After reviewing the record, I find that the ALJ's handling of these matters did not constitute harmful error. The ALJ did review and discuss the conflicting evidence with regard to Plaintiff's physical impairments.

Plaintiff is correct that the ALJ failed to provide a function-by-function analysis of Plaintiff's outer limits for sitting, lifting, standing, and walking during an eight-hour

workday. Pl. Br. at 17. The ALJ's decision did discuss Plaintiff's physical impairments, however, and provided a sufficient basis for her decision to discount the opinion of Dr. Withington with respect to those impairments. R. 32-33, 36-37, 39-40. My review of the record confirms that, while Ms. Blackman clearly has physical challenges caused mostly by the pain and weakness in her knees, the objective medical findings do not contradict the ALJ's findings that those issues do not rise to the level necessary to change the ALJ's RFC decision.

The record documents that Ms. Blackman is obese, being five feet, two inches, tall, with a weight fluxuating from approximately 220 pounds, resulting in a BMI of 38.97 (R. 297), to 190 pounds, resulting in a BMI of 34.75 (R. 289). She has had knee surgery in the past.[26] All of the orthopedic surgeons at Temple University Hospital who have seen Ms. Blackman over the years (Exhibit B1F), note that she suffers from significant knee pain, which has increased over the years, and her use of a cane is documented in the Temple Hospital Orthopedics Department records. R. 287. An MRI of her right knee confirmed "secondary osteoarthritis," which Orthopedic Surgeon Min Lu, M.D. believed on May 1, 2017 was "not severe enough in my opinion to warrant arthroplasty in a person of her age." R. 291. Notes from Matthew Lorei, M.D. (Orthopedic Surgery) after a complete examination on August 1, 2016 also concluded that a "knee replacement" was not warranted due to her young age and "minimal" pathology, however, Dr. Lorei also stated, "but I also think it might be reasonable to have the patient undergo distal patellar realignment surgery." R. 298.

---

[26] The medical records are conflicting, with a note written by Dr. Lorei on August 1, 2016 noting arthroscopic debridement of the left knee in 2002 (R. 297), while a note from the same medical practice, but a different Orthopedist, Eric Kropf, M.D., on September 15, 2016 noted the debridement of the left knee as occurring in 2012. (R. 293).

On May 21, 2019, Dr. Lorei saw Ms. Blackman, noting that he had not seen her for more than a year. He recommended a course of Voltaren twice daily for her knee pain, which she reported had increased, as had the frequency of her falls, which caused her to go the the emergency room three times in the preceding few months. R. 731-32. Dr. Lorei also recommended she continue to wear a hinged knee brace, and obtain an MRI of her left knee. R. 732. By May 21, 2019, Ms. Blackman had succeeded in lowering her BMI to 31.89, and Dr. Lorei's examination noted a more expanded range of motion in the left knee from 0 to 130 degrees. R. 729. At that time he recommended against surgery and suggested continued strengthening exercises for the knee and over-the-counter analgesics. R. 730. It was these findings relied upon by the ALJ in dismissing Ms. Blackman's knee problems as not warranting "extreme limitations." R. 42.

The ALJ did find that Plaintiff had severe impairments of osteoarthritis of both knees, chondromalacia patella of the left knee,[27] cubital tunnel syndrome, and obesity, in addition to her mental impairments. R. 31. Given the fact that Ms. Blackman obviously has physical impairments that affect her ability to work, it would have been preferable for the ALJ during the hearing to base her hypothetical question on the specific functions that Ms. Blackman may be capable of performing during a regular workday, rather than posing a hypothetical that Plaintiff "could perform light work as defined in the regulations." R. 88. Such a hypothetical becomes problematic for a

---

[27] "Chondromalacia patellae, also known as 'runner's knee,' is a condition where the cartilage on the undersurface of the patella (kneecap) deteriorates and softens. This condition is common among young, athletic individuals, but may also occur in older adults who have arthritis of the knee. *Chondromalacia: Causes, Symptoms, and Diagnosis*, https://www.healthline.com › chondromalacia-patella. (Visited June 28, 2022).

reviewing court where there is conflicting medical and non-medical evidence concerning objective physical limitations such as sitting, standing, and walking.

On remand, the ALJ should adhere to the requirements outlined in SSR 96–8p as suggested in Plaintiff's briefing, when assessing Ms. Blackman's RFC. In particular, the ALJ should cite the specific medical and nonmedical evidence which she relies upon in making her RFC determination, rather than merely reciting that the Plaintiff is capable of "light work." R. 35.[28] In her determination, the ALJ should describe the maximum amount of each work-related activity the plaintiff is able to perform during an eight-hour workday. *See Pearson v. Barnhart*, 380 F. Supp. 2d 496, 505–08 (D.N.J. 2005).

Finally, with regard to Plaintiff's argument that the ALJ failed to properly account for her use of a cane in the RFC, I find the Third Circuit's decision in *Howze v. Barnhart*, 53 F. App'x 218 (3d Cir. 2002) instructive.

> Appellant's argument that remand is necessary because the ALJ failed to address the fact that he uses a medically-required hand-held device fails as well. He testified that Dr. Kahn provided him with a cane to address left-leg weakness which causes him to lose his balance and fall. The references in the record include a reference by Dr. Khan to a "script" for a cane; in addition, Dr. Khan checked the box for "hand-held assistive device medically required for ambulation" in his 1998 report. T. at 199, 272. Other than that, there are multiple references to the fact that appellant uses a cane but no discussion of its medical necessity. The evidence presented by appellant was insufficient to support a finding that his cane was medically necessary. "To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed [.]" Social Security Ruling 96–9p. Even if the ALJ erred regarding the cane, though, any error was harmless as he asked the vocational expert to take the cane into account and there were still jobs available

---

[28] While it is standard practice to use the terms "light work," "sedentary work," etc., in the recitation of the RFC, these labels should be tied to a discussion somewhere in the opinion of the specific findings that the ALJ has made with regard to the outside limits of a claimant's ability to stand, sit, and walk during an eight-hour workday (where such physical limitations are alleged by the claimant). In this decision, I can find no such discussion.

that appellant could perform.

*Howze v. Barnhart*, 53 F. App'x 218, 222 (3d Cir. 2002). The circumstances in this case are similar. During the hearing, the ALJ posed a hypothetical to the Vocational Expert (VE) that took into account the use of a cane, which the VE testified would limit the Plaintiff to sedentary work. R. 89. The ALJ chose not to adopt this more restrictive RFC in her decision. Plaintiff argues that she was "prescribed" a cane for ambulation, however, the record cite in Plaintiff's brief for this assertion is, in fact, a record of an emergency room visit after a fall, in which Nina Gentile, M.D., the emergency room attending physician, "[a]dvised to ice/elevate and cane for ambulation. To [follow up] with Dr. Lorei if pain persists." R. 437. *See* Pl. Br. at 17. There is no indication in the record that Plaintiff's use of a cane was prescribed by a doctor, only that she began using one to avoid falling.

The ALJ chose to base her RFC on the first, rather than the second, hypothetical posed to the VE. As in *Howze,* any error by the ALJ on this issue was harmless, as there were still jobs available that Ms. Blackman could perform in this more restrictive category.

### C.  I will remand Ms. Blackman's case to the Commissioner for further review.

Where, as here, conflicting evidence has not been resolved, or the ALJ has not discussed all of the relevant evidence, remand is appropriate. *See Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001); *Leech v. Barnhart*, 111 F. App'x 652, 658–59 (3d Cir. 2004) (remand is appropriate where the ALJ "failed to make consistent findings and conclusions, but we are not prepared to hold that [claimant] necessarily is entitled to benefits…"). As there is conflicting substantial evidence which remains to be resolved

in this matter, there has not been inordinate delay in this case, and more material evidence may be unearthed given Ms. Blackman's medical conditions, I find that a remand is appropriate here. I make no judgments as to the weight of the evidence on the record but instruct the ALJ on remand to weigh all material evidence under the appropriate legal standards and to discuss and resolve evidence which contradicts her findings.

## VI.    <u>CONCLUSION</u>

Based upon the above, Plaintiff Rhonda Anita Blackman's Request for Review is granted. I find that the ALJ committed harmful error in disregarding opinions from Drs. Stern and Withington. The Commissioner's final decision is reversed and this matter remanded for review pursuant to the findings made here.


**BY THE COURT:**


*<u>s/Richard A. Lloret</u>*
**RICHARD A. LLORET**
**U.S. Magistrate Judge**